JMG/2011R00687

FEB 18 2015

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM. NO. JKB-15-06 |
| | ) | |
| v. | ) | (Conspiracy to Commit Wire Fraud |
| | ) | Affecting a Financial Institution, 18 |
| ALBERIC OKOU AGODIO, | ) | U.S.C. § 1349; Wire Fraud Affecting a |
| | ) | Financial Institution, 18 U.S.C. § 1343; |
| *Defendant.* | ) | Laundering of Monetary Instruments, 18 |
| | ) | U.S.C. § 1956(a)(1)(A)(i); Mail Fraud, 18 |
| | ) | U.S.C. § 1341; Aggravated Identity Theft, |
| | ) | 18 U.S.C. § 1028A(a)(1); Aiding and |
| | ) | Abetting and Causing an Act to Be Done, |
| | ) | 18 U.S.C. § 2) |

### INDICTMENT

The Grand Jury for the District of Maryland charges:

### COUNT ONE

#### (Conspiracy to Commit Wire Fraud
#### Affecting a Financial Institution)

#### INTRODUCTORY ALLEGATIONS

**A.    Relevant Parties, Persons, and Companies, and the
Mortgage Lending Process**

At all times relevant to this Indictment:

1.    Defendant **ALBERIC OKOU AGODIO (AGODIO)** was a resident of

Virginia.   **AGODIO** was educated and had employment experience as an accountant

and was the founder and principal employee of A&O Consulting, LLC, which provided

accounting and business consulting services, and AORE Investments, Inc., which

**AGODIO** described as a real estate firm based in Bethesda, Maryland.   Between

approximately June 2009 and November 2010, **AGODIO** carried out a mortgage fraud scheme in which he used the names of recent West African immigrants and students, coupled with false information about their financial assets and often their earnings as well, to obtain approximately $3.8 million in home mortgage loans that he used to purchase approximately three dozen row houses in Baltimore. **AGODIO** eventually ceased making the mortgage payments on these properties, all of which are now in default or foreclosure.

2. Mr. A.T., Mr. Y.A., Mr. Kokou A., Mr. K.B., Mr. Kokouvi A., Mr. Kossivi A., Ms. M.A.A., Mr. K.T., and Mr. J.P.B.B. were immigrants and students from West Africa who lived in the Maryland suburbs of Washington, D.C. **AGODIO** used the names of these individuals and others with similar backgrounds, employment, and financial profiles as nominee or "straw" purchasers in carrying out this mortgage fraud scheme.

3. Kevin C. Campbell (Campbell) was a resident of Maryland. From 2000-2011, Campbell operated E&W Realty, LLC, a company which was in the business of purchasing row houses in Baltimore City, performing necessary rehabilitation work, and then re-selling them. Between June 2009 and November 2010, Campbell's company sold approximately three dozen row houses in Baltimore City to the straw buyers recruited by **AGODIO.**

4. Loan Officer 1 was a resident of Maryland. From 1998 through 2011, he was employed as a loan officer for Transatlantic Mortgage, LLC (Transatlantic), a now-closed loan broker located in Reisterstown, Maryland that was in the business of helping home buyers obtain mortgage loans. Lenders and home mortgage brokers like Transatlantic require a prospective borrower to submit a standard Federal loan

application form known as the Uniform Residential Loan Application (URLA).   The URLA requires a borrower to provide truthful information concerning his or her current and recent employers and employment, gross monthly income, assets and liabilities, and monthly debt obligations, and to state whether they intend to use the property as their primary residence.   This information is material to potential lenders and government insurers, who rely upon it to assess the degree of credit risk the applicant presents and how well the property is likely to be maintained following the purchase.

5.    Loan Officer 1's responsibilities included soliciting and processing applications for home mortgage loans; gathering the required information concerning the prospective borrowers' creditworthiness; and then shopping the loan package to potential lenders.   If a lender agreed to fund a loan, Transatlantic received a commission when the transaction closed.   Between June 2009 and November 2010, Loan Officer 1 processed roughly three dozen mortgage loan applications from individuals whom **AGODIO** persuaded to purchase houses in Baltimore City.

6.    When Loan Officer 1 received the necessary information and documents from **AGODIO,** he assembled the loan package and then transmitted it to a mortgage lending business named Cardinal Financial Company, Ltd. Partnership (Cardinal). Cardinal was in the business of financing and refinancing home mortgage loans, and it operated from an office located in Warminster, Pennsylvania.   Cardinal maintained lines of credit with several financial institutions, including National City Bank (NCB) (subsequently incorporated into PNC Bank), from which it drew funds to finance home mortgage loans.   Shortly before the closing, these funds would be transmitted from Cardinal's account to that of the settlement company selected to handle the transaction.

3

7.      Once Cardinal approved a loan, it submitted an application for mortgage insurance to the Federal Housing Authority (FHA), an agency within the United States Department of Housing and Urban Development (HUD) that administers many loan guarantee and loan insurance programs designed to make homeownership more affordable.   FHA mortgage insurance provides lenders with protection against losses as a result of homeowners defaulting on their mortgage loans.   The lenders bear less risk because the FHA will reimburse the lender if it incurs a loss in the event of default.   In determining whether to issue FHA mortgage insurance on a particular loan, FHA analysts review the information and documentation previously submitted to the lender concerning the borrower's income, savings, monthly expenses and debt.   The accuracy of this information is material to, and is relied upon, the FHA in determining whether to issue FHA insurance to a lender on a particular home mortgage loan.

8.      Title Company 1, which was located in Towson, Maryland, acted as the settlement agent on all of the purchases **AGODIO** made from Campbell.   Settlement Agent 1, the owner of Title Company 1 and a resident of Maryland, conducted the closings on all of these transactions.

9.      The title company is responsible first for verifying that the seller has good title to the property.   Once this is established, a settlement agent from the title company presides over the closing of the loan and the passing of title.   The funds received from the mortgage lender, together with the amount tendered by the buyer for the down payment and his or her share of the closing costs, are then disbursed by the settlement agent according to the instructions he or she has received.   The settlement agent is typically responsible for paying off the existing mortgage from the seller's

4

lender; paying any outstanding property taxes; paying the fees necessary to record the deed; and then paying any remaining funds to the seller.

10.     The settlement agent is required to record these disbursements on a federally mandated settlement statement form known as the HUD-1, which the settlement agent, the buyer, and the seller must sign and certify as truthful and accurate subject to the penalties of perjury.   An Addendum to the HUD-1 requires the buyer to certify he or she has not received any undisclosed loans for the purpose of financing this transaction, and likewise requires the seller to certify that he or she has no knowledge of the buyer receiving any undisclosed loans for the purpose of financing the transaction, and also that the seller has not loaned or paid any part of the cash down payment or the buyer's share of the closing costs.   It is particularly important for the lender to know that a buyer's own funds are being used for the down payment and his or her share of the closing costs, because if someone other than the buyer provides these funds, that raises serious questions about the buyer's creditworthiness and also gives the buyer less of a financial incentive to remain in the house and make timely payments on the mortgage, since they will not risk the loss of their own funds if they default.   Following the closing, the settlement agent returns the originals of the signed HUD-1 and the closing file to the lender for its records.

11.     Once a loan extended by Cardinal closed and the real estate transaction concluded, Cardinal typically sold the loan to Wells Fargo Bank or to another bank or mortgage lending company active in what is called the secondary mortgage market. This enabled Cardinal to pay down its line of credit and realize its profit on the transaction.   If the FHA agreed to insure a loan, this made it easier for Cardinal to sell

the loan to a secondary lender.   A mortgage lending business like Cardinal is considered a "financial institution" under Title 18, United States Code, Section 20(10).

12.      Wells Fargo Bank (Wells Fargo), Bank of America, M&T, BB&T, Everbank, and Nationstar Mortgage Company each purchased home mortgage loans from Cardinal and then was responsible for servicing these loans thereafter, meaning that they received the monthly mortgage payments and then paid the necessary taxes, mortgage insurance payments, and any other required distributions from the funds they collected.   Each of these lenders were "financial institutions" as defined by Title 18, United States Code, Section 20, because their deposits were insured by the Federal Deposit Insurance Corporation (FDIC) and they were members of the Federal Home Loan Bank System.

**B.      The Conspiracy and the Scheme and Artifice to Defraud**

13.      Beginning in or about June 2009 and continuing thereafter until in or about November 2010, in the District of Maryland and elsewhere, defendant

**ALBERIC OKOU AGODIO,**

together with his co-conspirator and co-schemer Kevin Campbell and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree to knowingly devise a scheme and artifice to defraud Cardinal and the secondary lenders and the FHA, and to obtain money and property from Cardinal by means of materially false and fraudulent pretenses, representations, promises, and material omissions, as set forth below, and for the purpose of executing this scheme and attempting to do so, did knowingly cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, and sounds, in violation of Title 18, United States Code, Section 1343.

6

### C.   The Object and Purpose of the Conspiracy and the Scheme and Artifice to Defraud

14.   It was the object and purpose of the conspiracy and the scheme and artifice to defraud that **AGODIO** and his co-conspirators and co-schemers, through materially false and fraudulent representations, pretenses, and omissions directed at Cardinal, the secondary lenders, and the FHA, obtained aggregate financing totaling approximately $4.026 million.   This enabled **AGODIO** to purchase some three dozen properties from E&W Realty using the names of other persons, for which he received commission payments totaling in excess of $1.2 million from Campbell.   The fraudulently-obtained financing also allowed Campbell, Loan Officer 1, and others known to the Grand Jury to receive sales proceeds, fees, and commissions on the transactions.

### D.   The Manner and Means of the Conspiracy and the Scheme and Artifice to Defraud

15.   It was part of the conspiracy and the scheme and artifice to defraud that between in or about June 2009 and in or about November 2010, **AGODIO** persuaded approximately three dozen individuals who were originally from West Africa, none of whom had any experience in real estate transactions and who were relying upon his guidance, to purchase under their names row houses in Baltimore that were owned by E&W Realty.   In each case, **AGODIO** told the "straw purchaser" that he would assemble and submit the loan application using the person's employment, tax, and bank records; would manage the property following the purchase by finding renters, collecting their rent payments, and making the required mortgage payments; and would pay the straw purchaser a fee of $7,000 - $8,000 after the transaction closed. **AGODIO** further promised that he would sell the property in three years and that the

7

named buyer would receive up to 80% of the sale proceeds.   Finally, **AGODIO** promised and did pay thousands of dollars in additional commissions to those straw purchasers who referred other individuals to him as potential buyers for similar transactions.

16.    It was further a part of the conspiracy and the scheme and artifice to defraud that once **AGODIO** located a straw purchaser, he and Campbell then negotiated the purchase of one of the houses in E&W's inventory at an inflated price that was substantially above what Campbell felt he needed to receive to earn a reasonable return on the transaction.   This typically occurred without the straw purchaser having seen the property.   **AGODIO** then submitted the straw purchaser's loan application and what purported to be supporting documentation to Loan Officer 1 at Transatlantic.

17.    It was further a part of the conspiracy and the scheme to defraud that **AGODIO** employed the following false and fraudulent pretenses, representations, and material omissions to persuade Cardinal to issue mortgage loans to these borrowers:

(a)    **AGODIO** provided Loan Officer 1 with information and with completed loan applications for the prospective borrowers that contained materially false representations concerning their earnings and assets, and that also falsely represented that the purchaser would use the property as his or her primary residence, a fact that was material to potential lenders and the FHA since rental properties are more likely to be poorly maintained or damaged and to go into default; and

(b)    **AGODIO** provided fraudulent earning statements, tax records (Form W-2s), and bank statements for the named purchasers to Loan Officer 1 in order to "document" the materially false information provided in the loan applications.

These actions caused Cardinal to extend financing on the properties when it would not have done so had it known the true facts, and likewise caused the FHA to issue mortgage insurance on these properties and the secondary lenders to purchase the loans from Cardinal following the closings, thereby exposing Cardinal, the secondary lenders, and the FHA to higher-than-expected levels of financial risk.

18.     It was further a part of the conspiracy and the scheme and artifice to defraud that once Cardinal agreed to loan the funds necessary to finance the purchase of each property, **AGODIO** and his co-conspirators and co-schemers did the following additional things to permit the transactions to go to settlement; to hide the fact that the straw purchasers lacked the funds needed for the down payment and closing costs; and to compensate themselves and others for their role in each transaction:

(a)     Initially Campbell, and then subsequently **AGODIO**, provided the necessary funds for the down payment and the buyer's share of the closing costs, causing the HUD-1 settlement statement form to inaccurately reflect that the down payments and closing costs had been paid by the straw purchasers;

(b)     **AGODIO** knowingly permitted the straw purchasers to sign documents at closing falsely representing that they intended to use the subject property as their principal residence; and

(c)     Campbell paid an undisclosed "consulting fee" or kickback to **AGODIO** from the proceeds he received from Title Company 1 on each transaction, which **AGODIO** used to reimburse himself for providing the funds for the down

payment and closing costs, to pay the promised amount to the straw purchasers, and to provide himself with a substantial commission on each transaction.

19.     Following the closings, **AGODIO** retained the keys to each property, and assumed the responsibility for finding renters and making the required monthly mortgage payments.   The named purchasers never lived in the properties.   **AGODIO** eventually allowed all of the mortgages to go into default.

20.     By means of the materially false and fraudulent practices set forth above, **AGODIO** and his co-conspirators and co-schemers caused Cardinal to extend approximately $3.8 million in home mortgage loans under circumstances where it would not have done so had it known the true facts and circumstances.   As a result of **AGODIO**'s conduct and that of his co-conspirators and co-schemers, substantial losses, lost earnings, and expenses have been and will be suffered and incurred by Wells Fargo, the other secondary lenders, and the FHA as a result of the failure to repay the outstanding principal on these loans, the loss of expected interest payments, and the expenses involved in foreclosing upon and then maintaining and disposing of the properties.   Cardinal likewise has been placed at risk of legal action and substantial losses as a result of these fraudulent transactions.

18 U.S.C. § 1349

## COUNT TWO

### (Wire Fraud Affecting a Financial Institution: 4716 Pimlico Road, Baltimore, MD 21215)

1.     The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are realleged here.

2.     In the summer of 2009, defendant **AGODIO** persuaded Mr. A.T., an immigrant from Cameroon who lived in the Maryland suburbs of Washington, D.C., that he could qualify to purchase a home in Baltimore.   **AGODIO** requested and received copies of Mr. A.T.'s recent earning statements, W-2s, and bank statements.

3.     In the summer of 2009, Mr. A.T. was employed by the Target store chain. His bi-weekly gross (pre-tax) pay typically ranged between approximately $630 and $800.00, with take-home pay of between $530 and $670.00.   He maintained a checking account (ending in the numbers 2316) at Chevy Chase Bank, which had a balance of $235.69 as of July 9, 2009 and $198.56 as of August 11, 2009.

4.     **AGODIO** subsequently arranged to purchase 4716 Pimlico Road, Baltimore, MD 21215 in Mr. A.T.'s name from Campbell's company for $107,000.00.

5.     In furtherance of the purchase of 4716 Pimlico Road as part of the scheme to defraud, **AGODIO** committed the following fraudulent and deceptive acts:

- **AGODIO** submitted materially false information and fraudulent documentation about both Mr. A.T.'s gross pay (which was represented to be $2,426 monthly) and the balance he maintained with Chevy Chase Bank (which was represented to be in excess of $24,000) to Loan Officer 1 at Transatlantic, which Cardinal and the FHA respectively relied upon in

11

deciding to issue and to insure a home mortgage loan in the amount of $105,061 for the purpose of financing Mr. A.T.'s purchase of 4716 Pimlico;

- **AGODIO** caused Campbell to use his own funds to obtain an official bank check from Wachovia Bank in the amount of $10,937.84 to cover the down payment and the buyer's share of the closing costs, which was tendered to Settlement Agent 1 at the closing on August 11, 2009;

- **AGODIO** caused the settlement documents to falsely reflect that Mr. A.T. provided the funds for the down payment and closing costs, and to falsely represent that Mr. A.T. intended to use the house as his primary residence;

- **AGODIO** received an undisclosed commission from Campbell of $40,656.00 that was not reflected on any of the settlement documents subsequently provided by Title Company 1 to Cardinal or the FHA; and

- **AGODIO** used funds from his commission to pay an undisclosed fee of $5,000 to Mr. A.T. in connection with this transaction, which was likewise not reflected on any of the settlement documents.

6.      Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank. **AGODIO** subsequently ceased making the mortgage payments to Wells Fargo, and the mortgage went into default and the property into foreclosure.

12

## **The Charge**

7.      On or about August 11, 2009, in the District of Maryland and elsewhere, the defendant

### **ALBERIC OKOU AGODIO,**

for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain signs and signals: to wit, the transfer of $103,869.80, more or less, representing the proceeds of a home mortgage loan extended in connection with Mr. A.T.'s purchase of 4716 Pimlico Road, from Cardinal's line of credit account (# 9881) at JPMorganChase in New York to account # 3142 in the name of Title Company 1 at a SunTrust Bank branch located in Baltimore County, Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT THREE

### (Wire Fraud Affecting a Financial Institution:
### 2005 N. Smallwood Street, Baltimore, MD 21218)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are realleged here.

2.      In the summer of 2009, defendant **AGODIO** persuaded Mr. Y.A. that he could qualify to purchase a house in Baltimore.   **AGODIO** requested and received copies of Mr. Y.A.'s recent earning statements, W-2s, and bank statements.

3.      In the summer of 2009, Mr. Y.A. was employed by the Trader Joe's food store chain.   He maintained a checking account (ending in the numbers 5784) and a savings account (ending in the numbers 6878) at Bank of America, which had balances respectively of $83.57 and $0.20 as of August 25, 2009.

4.      **AGODIO** subsequently arranged to purchase a row house located at 2005 N. Smallwood Street, Baltimore, MD 21216 from E&W Realty in Mr. Y.A.'s name for $106,500.00.

5.      In furtherance of the purchase of 2005 N. Smallwood Street as part of the scheme to defraud, **AGODIO** committed the following fraudulent and deceptive acts:

- **AGODIO** transmitted materially false information and fraudulent supporting documentation about the combined balance that Mr. Y.A. maintained in his accounts at Bank of America (which was represented to be $31,000 or more) to Loan Officer 1 at Transatlantic, and also created or caused to be created and then supplied to Transatlantic fraudulent bank statements purporting to come from Bank of America, which Cardinal and

the FHA relied upon in respectively deciding to issue and to insure a home mortgage loan of approximately $104,570.00 for the purpose of financing Mr. Y.A.'s purchase of 2005 N. Smallwood Street;

- **AGODIO** provided Mr. Y.A. with a cashier's check in the amount of $11,540.94 that Campbell had obtained to cover the down payment and the buyer's share of the closing costs at settlement;

- **AGODIO** caused the settlement documents to falsely reflect that Mr. Y.A. had provided the required funds for the down payment and closing costs, and to falsely represent that Mr. Y.A. intended to use the house as his primary residence;

- **AGODIO** received an undisclosed commission from Campbell of $53,309.00 that was not reflected on any of the settlement documents subsequently provided by Title Company 1 to Cardinal or the FHA;

- **AGODIO** used funds from his commission to pay an undisclosed fee of $7,500 to Mr. Y.A. in connection with this transaction, which likewise was not reflected on any of the settlement documents.

6.    Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank. **AGODIO** made regular mortgage payments to Wells Fargo for some time, but he eventually ceased doing so, causing the mortgage to go into default and the property into foreclosure.

## **The Charge**

7.      On or about October 15, 2009, in the District of Maryland and elsewhere, the defendant

### **ALBERIC OKOU AGODIO,**

for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain signs and signals: to wit, the transfer by wire of $103,920.19, more or less, representing the proceeds of a home mortgage loan extended in connection with Mr. Y.A.'s purchase of 2005 N. Smallwood Street, from the NCB Funding Account for Cardinal Financial Company Limited Partnership (# 0510) at National City Bank in Louisville, Kentucky to account # 3142 in the name of Title Company # 1 at a SunTrust Bank branch located in Baltimore County, Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT FOUR

### (Wire Fraud Affecting a Financial Institution: 3036 Harlem Avenue, Baltimore, MD 21216)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are realleged here.

2.      In or about the fall of 2009, defendant **AGODIO** persuaded Mr. Kokou A. that he could qualify to purchase a house in Baltimore.   **AGODIO** requested and received copies of Mr. Kokou A.'s recent earning statements, W-2s, and bank statements.

3.      In the summer and fall of 2009, Mr. Kokou A. was employed by Rodman Discount Drug Store and typically received gross pay of between $875 and $933 every two weeks.   He maintained a bank account (ending in the numbers 1657) at Chevy Chase Bank, which had a balance of $91.55 as of October 19, 2009.

4.      **AGODIO** subsequently arranged to purchase a row house located at 3036 Harlem Avenue, Baltimore, MD 21216 from E&W Realty in Mr. Kokou A.'s name for $110,000.00.

5.      In furtherance of the purchase of 3036 Harlem Avenue as part of the scheme to defraud, **AGODIO** committed the following fraudulent and deceptive acts:

- **AGODIO** transmitted materially false information and fraudulent supporting documentation concerning Mr. Kokou A.'s gross pay (which was represented to be $2,249 monthly) with Rodman Discount Drug and the balance he maintained in his account at Chevy Chase Bank (which was represented to be at least $31,000) to Loan Officer 1 at Transatlantic,

17

which Cardinal and the FHA relied upon in respectively deciding to issue and to insure a home mortgage loan of approximately $108,007.00 for the purpose of financing Mr. Kokou A.'s purchase of 3036 Harlem Avenue;

- **AGODIO** provided Mr. Kokou A. with approximately $11,844 of his own funds in cash on the day of the closing, which he caused Mr. Kokou A. to use to purchase a cashier's check in the amount of $11,843.79 to cover the down payment and the buyer's share of the closing costs;

- **AGODIO** caused the settlement documents to falsely reflect that Mr. Kokou A. had provided the funds for the down payment and buyer's share of the closing costs, and to reflect that Mr. Kokou A. intended to use the house as his primary residence;

- **AGODIO** received an undisclosed commission from Campbell in the amount of $31,759.00 that was not reflected on any of the settlement documents provided by Title Company 1 to Cardinal or the FHA;

- **AGODIO** used funds from his commission to pay an undisclosed fee of $7,500 to Mr. Kokou A. in connection with this transaction, which likewise was not reflected on any of the settlement documents.

5.     Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank. **AGODIO** made mortgage payments to Wells Fargo for about a year, but he then ceased doing so, causing the mortgage to go into default and the property into foreclosure.

18

## **The Charge**

6.      On or about December 1, 2009, in the District of Maryland and elsewhere, the defendant

### **ALBERIC OKOU AGODIO,**

for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain signs and signals: to wit, the transfer by wire of $107,360.07, representing the proceeds of a home mortgage loan extended in connection with Mr. Kokou A.'s purchase of 3036 Harlem Avenue, from the NCB Funding Account for Cardinal Financial Company Limited Partnership (# 0510) at National City Bank in Louisville, Kentucky to account # 3142 in the name of Title Company 1 at a SunTrust Bank branch located in Baltimore County, Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT FIVE

### (Wire Fraud Affecting a Financial Institution:
### 2814 Oswego Avenue, Baltimore, MD 21215)

1.     The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are realleged here.

2.     In or about the fall of 2009, defendant **AGODIO** persuaded Mr. K.B. that he could qualify to purchase a house in Baltimore.   **AGODIO** requested and received copies of Mr. K.B.'s recent earning statements, W-2s, and bank statements.

3.     In the autumn of 2009, Mr. K.B. was employed by the District of Columbia Water and Sewage Authority on a less than full-time basis, and his bi-weekly pay checks that fall ranged from $200-$250 to over $500.   His year-to-date earnings as of December 5, 2009 from the Water and Sewage Authority totaled $8,278.48.   He maintained a checking account (ending in the numbers 2554) and a savings account (ending in the numbers 8229) at Bank of America, which had combined balances of $599.09 as of October 16, 2009 and $6.29 as of November 13, 2009.

4.     **AGODIO** subsequently arranged to purchase a row house located at 2814 Oswego Avenue, Baltimore, MD 21215 from E&W Realty in Mr. K.B.'s name for $110,000.00.

5.     In furtherance of the purchase of 2814 Oswego Avenue as part of the scheme to defraud, **AGODIO** committed the following fraudulent and deceptive acts:

- **AGODIO** transmitted materially false information and fraudulent supporting documentation concerning Mr. K.B.'s gross pay from the District of Columbia Water and Sewage Authority, as well as the combined

balance he maintained in his accounts at Bank of America (which was represented to be at least $20,000) to Loan Officer 1 at Transatlantic, which Cardinal and the FHA relied upon in respectively deciding to issue and to insure a home mortgage loan of approximately $108,007.00 for the purpose of financing Mr. K.B.'s purchase of 2814 Oswego Avenue;

- **AGODIO** provided Mr. K.B. with approximately $11,500 of his own funds in cash on the day of the closing, which he caused Mr. K.B. to use to purchase a cashier's check for the purpose of covering the down payment and the buyer's share of the closing costs;

- **AGODIO** caused the settlement documents to falsely reflect that Mr. K.B. had provided the funds for the down payment and the buyer's share of the closing costs, and to falsely represent that Mr. K.B. intended to use the house as his primary residence;

- **AGODIO** received an undisclosed commission from Campbell of $31,678.00 that was not reflected on any of the settlement documents subsequently provided by Title Company 1 to Cardinal or the FHA;

- **AGODIO** used funds from his commission to pay an undisclosed fee of $8,000 to Mr. K.B. in connection with this transaction, which likewise was not reflected on any of the settlement documents.

6.     Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank. **AGODIO** made mortgage payments to Wells Fargo for about a year, but he eventually ceased doing so, causing the mortgage to go into default and the property into foreclosure.

## The Charge

7.     On or about December 3, 2009, in the District of Maryland and elsewhere, the defendant

### ALBERIC OKOU AGODIO,

for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain signs and signals: to wit, the transfer of $107,675.76, representing the proceeds of a home mortgage loan extended in connection with Mr. K.B.'s purchase of 2814 Oswego Avenue, from the NCB Funding Account for Cardinal Financial Company Limited Partnership (# 0510) at National City Bank in Louisville, Kentucky to account # 3142 in the name of Title Company 1 at a SunTrust Bank branch located in Baltimore County, Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT SIX

### (Wire Fraud Affecting a Financial Institution: 3125 Baker Street, Baltimore, MD 21216)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are realleged here.

2.      In or about the fall of 2009, defendant **AGODIO** persuaded Mr. Kokouvi A. that he could qualify to purchase a house in Baltimore.   **AGODIO** requested and received copies of Mr. Kokouvi A.'s recent earning statements, W-2s, and bank statements.

3.      In the late summer and fall of 2009, Mr. Kokouvi A. was employed by Trader Joe's on a less than full-time basis.   His gross pay was typically in the range of $550 to $630 bi-weekly, and his take-home pay ranged from $330 to $450.   He maintained a checking account (ending in the numbers 1318) and a savings account (ending in the numbers 5949) at Bank of America, which had balances respectively of $817.95 and $3.54 as of October 6, 2009.

4.      **AGODIO** subsequently arranged to purchase a row house located at 3125 Baker Street, Baltimore, MD 21216 from E&W Realty in Mr. Kokouvi A.'s name for $115,000.00.

5.      In furtherance of the purchase of 3125 Baker Street as part of the scheme to defraud, **AGODIO** committed the following materially false and fraudulent acts:

- **AGODIO** transmitted materially false information and fraudulent supporting documentation concerning Mr. Kokouvi A.'s gross pay (which was represented to be $2,114.67) and his hours worked from Trader Joe's,

along with the combined balance he maintained in his accounts at Bank of America (which was represented to be over $30,000), to Loan Officer 1 at Transatlantic, which Cardinal relied upon in deciding to issue a home mortgage loan of approximately $112,917.00 to finance Mr. Kokouvi A.'s purchase of 3125 Baker Street;

- **AGODIO** provided Mr. Kokouvi A. with approximately $11,130 of his own funds in cash on the day of the closing, which he caused Mr. Kokouvi A. to use to purchase a cashier's check in that same amount to cover the down payment and the buyer's share of the closing costs;

- **AGODIO** caused the settlement documents to falsely reflect that Mr. Kokouvi A. had provided the down payment and the buyer's share of the closing costs, and to falsely represent that Mr. Kokouvi A. intended to use the house as his primary residence;

- **AGODIO** received an undisclosed commission from Campbell in the amount of $34,550.00 that was not reflected on any of the settlement documents provided by Title Company 1 to Cardinal or the FHA;

- **AGODIO** used funds from his commission to pay an undisclosed fee of $7,500 to Mr. Kokouvi A. in connection with this transaction, which likewise was not reflected on any of the settlement documents.

6.      Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank.

**AGODIO** eventually ceased making the mortgage payments to Wells Fargo, causing the

mortgage to go into default and the property into foreclosure.

### The Charge

7.      On or about December 10, 2009, in the District of Maryland and

elsewhere, the defendant

### ALBERIC OKOU AGODIO,

for the purpose of executing and attempting to execute the aforementioned scheme and

artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by

means of wire communications, certain signs and signals: to wit, the transfer by wire of

$107,645.04, more or less, representing the proceeds of a home mortgage loan extended

in connection with Mr. Kokouvi A.'s purchase of 3125 Baker Street, from the NCB

Funding Account for Cardinal Financial Company Limited Partnership (# 0510) at

National City Bank in Louisville, Kentucky to account # 3142 in the name of Title

Company 1 at a SunTrust Bank branch located in Baltimore County, Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT SEVEN

## (Wire Fraud Affecting a Financial Institution:
## 1804 N. Carey Street, Baltimore, MD 21217)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are realleged here.

2.      In or about the fall of 2009, defendant **AGODIO** persuaded Mr. Kossivi A. that he could qualify to purchase a house in Baltimore.   **AGODIO** requested and received copies of Mr. Kossivi A.'s recent earning statements, W-2s, and bank statements.

3.      In the fall of 2009, Mr. Kossivi A. was employed by Trader Joe's.   He maintained a checking account (ending in the numbers 4031) and a savings account (ending in the numbers 1898) at Bank of America, which had a balances of $268.60 and $17.67 respectively as of November 24, 2009.

4.      **AGODIO** subsequently arranged to purchase a row house located at 1804 N. Carey Street, Baltimore, MD 21217 from E&W Realty in Mr. Kossivi A.'s name for $110,000.00.

5.      In furtherance of the purchase of 1804 N. Carey Street as part of the scheme to defraud, **AGODIO** committed the following fraudulent and deceptive acts:

- **AGODIO** transmitted materially false information and fraudulent supporting documentation concerning the combined balance Mr. Kossivi A. maintained in his accounts at Bank of America (which was represented to be in excess of $22,000) to Loan Officer 1 at Transatlantic, which Cardinal and the FHA relied upon in respectively deciding to issue and to

26

insure a home mortgage loan of approximately $108,007.00 for the purpose of financing Mr. Kossivi A.'s purchase of 1804 N. Carey Street;

- **AGODIO** provided Mr. Kossivi A. with approximately $14,728.12 of his own funds in cash on the day of the closing, which he caused Mr. Kossivi A. to use to purchase a cashier's check in that same amount to cover the down payment and the buyer's share of the closing costs;

- **AGODIO** caused the settlement documents to falsely reflect that Mr. Kossivi A. had provided the funds for the down payment and the buyer's share of the closing costs, and to falsely represent that Mr. Kossivi A. intended to use the house as his primary residence;

- **AGODIO** received an undisclosed commission from Campbell in the amount of $29,277.00 that was not reflected on any of the settlement documents provided by Title Company 1 to Cardinal or the FHA,

- **AGODIO** used funds from his commission to provide Mr. Kossivi A. undisclosed fees and credits totaling $7,050 (a check and payment of credit card debts) in connection with this transaction, which likewise was not reflected on any of the settlement documents.

5.      Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank. **AGODIO** eventually ceased making the monthly payments to Wells Fargo, causing the mortgage to go into default and the property into foreclosure.

## The Charge

6. On or about January 28, 2010, in the District of Maryland and elsewhere, the defendant

### ALBERIC OKOU AGODIO,

for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain signs and signals: to wit, the transfer by wire of $106,826.37, more or less, representing the proceeds of a home mortgage loan extended in connection with Mr. Kossivi A.'s purchase of 1804 N. Carey Street, from Cardinal's line of credit account (# 9881) at JPMorganChase in New York to account # 3142 in the name of Shore Thing Title at a SunTrust Bank branch located in Baltimore County, Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT EIGHT

### (Wire Fraud Affecting a Financial Institution: 2692 Saint Benedict Street, Baltimore, MD 21223)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are realleged here.

2.      In or about the fall of 2009 and the winter of 2010, defendant **AGODIO** persuaded Ms. M.A.A. that she could qualify to purchase a house in Baltimore. **AGODIO** requested and received copies of Ms. M.A.A.'s recent earning statements, W-2s, and bank statements.

3.      In the fall of 2009 and the winter of 2010, Ms. M.A.A. was employed by Quiznos.   She maintained a checking account (ending in # 2379) at Bank of America, which had a balance of $1,495.01 as of November 12, 2009 and $1,667.74 as of December 15, 2009.

4.      **AGODIO** subsequently arranged to purchase a row house located at 2692 Saint Benedict Street, Street, Baltimore, MD 21223 from E&W Realty in Ms. M.A.A.'s name for $110,000.00.

5.      In furtherance of the purchase of 2692 Saint Benedict Street as part of the scheme to defraud, **AGODIO** committed the following fraudulent and deceptive acts:

- **AGODIO** transmitted materially false information and fraudulent supporting documentation concerning the balance Ms. M.A.A. maintained in her account at Bank of America (which was represented to be over $19,000) to Loan Officer 1 at Transatlantic, which Cardinal and the FHA relied upon in respectively deciding to issue and to insure a home

mortgage loan of approximately $108,007.00 for the purpose of financing Ms. M.A.A.'s purchase of 2692 Saint Benedict Street;

- **AGODIO** provided Ms. M.A.A. with approximately $11,180.00 of his own funds in cash on the day of the closing, which he caused Ms. M.A.A. to use to purchase a cashier's check in that same amount to cover the down payment and the buyer's share of the closing costs;

- **AGODIO** caused the settlement documents to falsely reflect that Ms. M.A.A. had provided the funds for the down payment and closing costs, and to falsely represent that Ms. M.A.A. intended to use the house as her primary residence;

- **AGODIO** received an undisclosed commission from Campbell in the amount of $31,311.00 that was not reflected on any of the settlement documents provided by Title Company 1 to Cardinal or the FHA;

- **AGODIO** used funds from his commission to provide Ms. M.A.A. with an undisclosed fee of $7,500 in connection with this transaction, which likewise was not reflected on any of the settlement documents that were subsequently provided to Cardinal and the FHA.

6.      Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank. **AGODIO** eventually ceased making the monthly payments to Wells Fargo, causing the mortgage to go into default, and the property into foreclosure.

## The Charge

7.     On or about January 28, 2010, in the District of Maryland and elsewhere, the defendant

### ALBERIC OKOU AGODIO,

for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain signs and signals: to wit, a wire transfer in the amount of $107,845.50, more or less, representing the proceeds of a home mortgage loan extended in connection with Ms. M.A.A.'s purchase of 2692 Saint Benedict Street, from Cardinal's line of credit account (# 9881) at JPMorganChase in New York to account # 3281 in the name of Shore Thing Title at a Wachovia Bank location in Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT NINE

### (Wire Fraud Affecting a Financial Institution: 2730 Edmondson Avenue, Baltimore, MD 21223)

1.    The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are realleged here.

2.    In or about the fall of 2009 and the winter of 2010, defendant **AGODIO** persuaded Mr. K.T. that he could qualify to purchase a house in Baltimore.   **AGODIO** requested and received copies of Mr. K.T.'s recent earning statements, W-2s, and bank statements.

3.    In the fall of 2009 and the winter of 2010, Mr. K.T. was employed by Target and also by Macy's, from which he respectively received monthly gross pay of approximately $1,000-1,100 and $400-$800.   He maintained a checking account (ending in the numbers 7904) and a savings account (ending in the numbers 7917) at Bank of America, which had balances of $71.86 and $18.50 respectively as of November 24, 2009.

4.    **AGODIO** subsequently arranged to purchase a row house located at 2730 Edmondson Avenue, Baltimore, MD 21223 from E&W Realty in Mr. K.T.'s name for $115,000.00.

5.    In furtherance of the purchase of 2730 Edmondson Avenue as part of the scheme to defraud, **AGODIO** committed the following fraudulent and deceptive acts:

- **AGODIO** transmitted materially false information and fraudulent supporting documentation about Mr. K.T.'s gross earnings (which were represented to be $3,367 monthly) and the combined balance Mr. K.T.

maintained in his accounts at Bank of America (which was represented to be at least $25,000) to Loan Officer 1 at Transatlantic, which Cardinal and the FHA relied upon in respectively deciding to issue and to insure a home mortgage loan of approximately $112,917.00 for the purpose of financing Mr. K.T.'s purchase of 2730 Edmondson Avenue;

- **AGODIO** provided Mr. K.T. with approximately $12,530.00 of his own funds in cash on the day of the closing, which he caused Mr. K.T. to use to purchase a cashier's check in that same amount to cover the down payment and the buyer's share of the closing costs;

- **AGODIO** caused the settlement documents to falsely reflect that Mr. K.T. had provided the funds for the down payment and the buyer's share of the closing costs, and to falsely represent that Mr. K.T. intended to use the house as his primary residence;

- **AGODIO** received an undisclosed commission from Campbell in the amount of $37,322.00 that was not reflected on any of the settlement documents provided by Title Company 1 to Cardinal or the FHA;

- **AGODIO** used funds from his commission to provide Mr. K.T. with an undisclosed fee of $7,500 in connection with this transaction, which likewise was not reflected on any of the settlement documents that were subsequently provided to Cardinal and the FHA.

6.      Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank. **AGODIO** eventually ceased making the monthly payments to Wells Fargo, causing the mortgage to go into default and the property into foreclosure.

## **The Charge**

7.     On or about February 8, 2010, in the District of Maryland and elsewhere, the defendant

### **ALBERIC OKOU AGODIO,**

for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain signs and signals: to wit, the transfer by wire of $112,744.34, more or less, representing the proceeds of a home mortgage loan extended in connection with Mr. K.T.'s purchase of 2730 Edmondson Avenue, from the NCB Funding Account for Cardinal Financial Company Limited Partnership (# 0510) at National City Bank in Louisville, Kentucky to account # 3142 in the name of Title Company 1 at a SunTrust Bank branch located in Baltimore County, Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT TEN

### (Wire Fraud Affecting a Financial Institution:
### 1611 N. Longwood Street, Baltimore, MD 21216)

1.     The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are incorporated here.

2.     In or about the winter of 2010, defendant **AGODIO** persuaded Mr. J.P.B.B., who was a resident of the Maryland suburbs of Washington, D.C., that he could qualify to purchase a house in Baltimore.   **AGODIO** requested and received copies of Mr. J.P.B.B.'s recent earning statements, W-2s, and bank statements.

3.     In the fall of 2009 and winter of 2010, Mr. J.P.B.B. was employed as an accountant with a firm called Burness Communications, Inc.   He maintained a checking account and a savings account at MCT Federal Credit Union, which had a combined balance of $5,050.76 as of January 31, 2010 and $10,062.50 on February 28, 2010.

4.     **AGODIO** subsequently arranged to purchase a row house located at 1611 N. Longwood Street, Baltimore, MD 21216 from E&W Realty in Mr. J.P.B.B.'s name for $115,000.00.

5.     In furtherance of the purchase of 1611 N. Longwood Street as part of the scheme to defraud, **AGODIO** committed the following fraudulent and deceptive acts:

- **AGODIO** transmitted materially false information and fraudulent supporting documentation concerning the combined balances Mr. J.P.B.B. maintained in his accounts at MCT Federal Credit Union (which was represented to be at least $25,000) to Loan Officer 1 at Transatlantic,

which Cardinal and the FHA relied upon in respectively deciding to issue and to insure a home mortgage loan of approximately $112,917.00 for the purpose of financing the purchase of 1611 N. Longwood Street by Mr. J.P.B.B.;

- **AGODIO** provided Mr. J.P.B.B. with approximately $12,368.69 of his own funds in cash on the day of the closing, which he caused Mr. J.P.B.B. to use to purchase a cashier's check in that same amount to cover the down payment and the buyer's share of the closing costs;

- **AGODIO** caused the settlement documents to falsely reflect that Mr. J.P.B.B. had provided the necessary funds for the down payment and closing costs, and to falsely represent that Mr. J.P.B.B. intended to use the house as his primary residence;

- **AGODIO** received an undisclosed commission from Campbell in the amount of $39,702.00 that was not reflected on any of the settlement documents provided by Title Company 1 to Cardinal or the FHA;

- **AGODIO** used funds from his commission to provide Mr. J.P.B.B. with an undisclosed fee of $7,500 in connection with this transaction, which likewise was not reflected on any of the settlement documents that were subsequently provided to Cardinal and the FHA.

6.      Shortly after the closing, Cardinal sold the loan to Wells Fargo Bank. **AGODIO** eventually ceased making the monthly payments to wells Fargo, causing the mortgage to go into default and the property into foreclosure.

36

## **The Charge**

7.   On or about March 5, 2010, in the District of Maryland and elsewhere, the defendant

### **ALBERIC OKOU AGODIO,**

for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, did transmit and cause to be transmitted in interstate commerce, by means of a wire communication, certain signs and signals: to wit, a wire transfer in the amount of $113,142.35, more or less, representing the proceeds of a home mortgage loan extended in connection with Mr. J.P.B.B.'s purchase of 1611 N. Longwood Street, from the NCB Funding Account for Cardinal Financial Company Limited Partnership (# 0510) at PNC Bank in Cincinnati, Ohio to account # 3142 in the name of Title Company 1 at a SunTrust Bank branch located in Baltimore County, Maryland.

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNTS ELEVEN THROUGH THIRTEEN

### (Laundering of Monetary Instruments)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One are incorporated here.

2.      On or about the dates indicated below, in the District of Maryland and elsewhere, the defendant

### ALBERIC OKOU AGODIO

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, the issuance of the checks identified below, which involved the proceeds of a specified unlawful activity, that is, wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343, with the intent to promote the carrying on of the specified unlawful activity by paying fees to individuals who referred other prospective house buyers to **AGODIO**, whose names were then used by him as straw purchasers in subsequent fraudulent real estate transactions:

| COUNT | DATE | DESCRIPTION OF FINANCIAL TRANSACTION |
|-------|------|--------------------------------------|
| 11 | March 12, 2010 | Payment of $2,000 fee to Mr. K.T. for referral of Mr. J.P.B.B. as a prospective home buyer by means of Check 1148 drawn on AO Consulting Service account at PNC Bank (account # ending in 2731) |
| 12 | May 10, 2010 | Payment of $2,000 fee to Mr. K.T. for referral of Mr. K.D. as a prospective home buyer by means of Check 094 drawn on AORE Investment, Inc. account at Wachovia Bank (account # ending in 1049) |
| 13 | June 1, 2010 | Payment of $2,000 fee to Mr. J.P.B.B. for referral of Mr. Komla A. as a prospective home buyer by means of Check 1009 drawn on the AORE Investment, Inc. account at Wachovia Bank (account # ending in 1049) |

18 U.S.C. § 1956(a)(1)(A)(i)

## COUNT FOURTEEN

### (Mail Fraud)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One, and in paragraphs 2 through 6 of Count Two, are realleged here.

2.      In connection with the purchase of 4716 Pimlico Road in August 2009, defendant **AGODIO**, using the name of Mr. A.T., applied for and obtained a homeowner's insurance policy from State Farm Fire & Casualty Company.

3.      In or about the summer of 2010, a fire occurred at 4716 Pimlico Road, causing significant damage to the property.   **AGODIO** subsequently submitted a claim in Mr. A.T.'s name (Claim # 20-N030-052) to State Farm by telephone on July 27, 2010, seeking payment under the policy for the repair of the damage caused by the fire.

4.      On or about August 5, 2010, **AGODIO** reported to the State Farm claims office in Woodlawn, Maryland for an interview with a claims representative.   During this interview, **AGODIO** falsely identified himself as Mr. A.T., and gave the claims representative Mr. A.T.'s birthdate (**/**/1986) when he was asked to provide his date of birth for identification purposes.   **AGODIO** also falsely represented that:

- he had lived at 4716 Pimlico for most of the period since it was purchased in August 2009;

- he worked for Target; and

- he was originally from Cameroon and travelled back there on occasion in connection with an import/export business he conducted.

5.      On or about December 14, 2010, State Farm sent a letter addressed to Mr. A.T. at an address in Fairfax, Virginia that had been provided to them by **AGODIO** and

where **AGODIO** was then residing.    Enclosed with the letter was a claim payment check in the amount of $106,500.10.    State Farm made this check jointly payable to Mr. A.T. and Wells Fargo Bank as the mortgage lienholder on 4716 Pimlico.    It was State Farm's expectation that the check would be credited to the Wells Fargo escrow account to pay for the cost of the expected repairs on the property.

6.    **AGODIO** endorsed the check with what purported to be the signature of Mr. A.T., as well as his own signature, and then deposited it into a personal bank account ending in the numbers # 0861 that he maintained with Wells Fargo on December 20, 2010.    Between that date and December 31, 2010, **AGODIO** used substantially all of these funds to write checks (often for mortgage payments) to make transfers to other accounts he controlled.    **AGODIO** did not notify Wells Fargo that these funds had been received to pay for the cost of repairs to the property, and he did not arrange for the repairs to be made or for the funds to be used to pay for the repairs.

7.    On or about February 9, 2011, **AGODIO** submitted by fax an additional claim to State Farm for the replacement cost of personal items and furnishings that he claimed had been lost in the fire, which totaled $21,958.91.

8.    On or about March 22, 2011, **AGODIO** reported to the State Farm claims office in Silver Spring, Maryland for an interview with a claims representative.    During the course of this interview, **AGODIO** falsely identified himself as Mr. A.T.; gave the claims representative Mr. A.T.'s birthdate (\*\*/\*\*/1986) when he was asked to provide his date of birth for identification purposes; and also falsely represented that he was still working for Target.    **AGODIO** also repeated his claim that the items listed in his

February 9th fax had been destroyed in the fire at 4716 Pimlico.    State Farm
subsequently denied **AGODIO**'s supplemental claim of February 9th.

### The Charge

9.      On or about December 14, 2010, in the District of Maryland, the defendant

### ALBERIC OKOU AGODIO,

having devised and intending to devise a scheme and artifice to defraud and to obtain

money and property by means of materially false and fraudulent pretenses,

representations and promises, and for the purpose of executing this scheme and artifice

to defraud, did knowingly cause to be placed in any post office or authorized depository

for mail matter to be sent or delivered by the Postal Service, and did knowingly cause to

be delivered by mail according to the direction thereon, an envelope containing a letter

addressed to Mr. A.T.; a State Farm check in the amount of $106,500.10 made payable

to Mr. A.T. and Wells Fargo Bank; a document titled "Explanation of Building

Replacement Cost Benefit Homeowner's Policy" and an estimate for the cost of the

needed repairs to 4716 Pimlico Road, which was sent and delivered from a State Farm

office located in Frederick, Maryland to an address in Fairfax, Virginia provided to State

Farm by **AGODIO**.

18 U.S.C. § 1341
18 U.S.C. § 2(b)

41

## COUNT FIFTEEN

### (Aggravated Identity Theft)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One, in paragraphs 2 through 6 of Count Two, and in paragraphs 2 through 8 of Count Fourteen, are realleged here.

2.      On or about August 5, 2010, in the District of Maryland, the defendant

**ALBERIC OKOU AGODIO,**

during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), did knowingly possess and use, without lawful authority, a means of identification of another person, knowing that the means of identification belonged to another person, to wit: the defendant used the name and the date of birth (\*\*/\*\*/1986) of Mr. A.T. during and in relation to the crime of mail fraud under 18 U.S.C. § 1341 as set forth in Count Fourteen of the Indictment.

18 U.S.C. §s 1028A(a)(1) & (c)(5)

## COUNT SIXTEEN

## (Aggravated Identity Theft)

1.      The allegations contained in paragraphs 1 through 12 and 14 through 20 of Count One, in paragraphs 2 through 6 of Count Two, and in paragraphs 2 through 8 of Count Fourteen, are realleged here.

2.      On or about March 22, 2011, in the District of Maryland, the defendant

### ALBERIC OKOU AGODIO,

during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), did knowingly possess and use, without lawful authority, a means of identification of another person, knowing that the means of identification belonged to another person, to wit: the defendant used the name and the date of birth (\*\*/\*\*/1986) of Mr. A.T. during and in relation to the crime of mail fraud under 18 U.S.C. § 1341 as set forth in Count Fourteen of the Indictment.

18 U.S.C. §s 1028A(a)(1) & (c)(5)

## FORFEITURE ALLEGATION

1.        Upon conviction of one or more of the wire or mail fraud offenses alleged in Counts Two through Ten and in Count Fourteen of this Indictment, or a conspiracy to commit the offense of wire fraud as alleged in Count One, defendant **AGODIO** shall forfeit to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c) all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to the scheme to defraud.

2.        The property to be forfeited includes, but is not limited to, the following:

> **Money Judgment:**
>
> A sum of money, $3,925,841.00 more or less, which is equal
> to the total amount of any property, real or personal, which
> constitutes or is derived from proceeds traceable to the
> schemes to defraud.

3.        If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

- cannot be located upon the exercise of due diligence;

- has been transferred, sold to, or deposited with a third party;

- has been placed beyond the jurisdiction of the court;

- has been substantially diminished in value; or

- has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by

28 U.S.C. § 2461(c), to seek forfeiture of any other substitute property of the defendant's

up to the value of the forfeitable property described above.

18 U.S.C. § 981(a)(1)(c)
18 U.S.C. § 982(a)(1)
18 U.S.C. § 1343
28 U.S.C. § 2461(c)
Fed. R. Crim. P. 32.2(a)


_____
ROD J. ROSENSTEIN
UNITED STATES ATTORNEY
FOR THE DISTRICT OF MARYLAND


A TRUE BILL:

**SIGNATURE REDACTED**
_____
Foreperson

Date:   February ___18___, 2015

45